# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 1, 2008 Session

## STATE OF TENNESSEE v. TONY WOLFE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 05-00559     John P. Colton, Jr., Judge**

---

**No. W2008-01243-CCA-R3-CD  - Filed April 8, 2009**

---

The defendant, Tony Wolfe, was convicted of first degree premeditated murder.  On appeal, he argues that: 1) the trial court was prejudiced against defense counsel during the course of the trial; 2) the trial court abused its discretion by conducting trial during the evening; 3) the assistant district attorney general intentionally distracted trial counsel during the course of the trial; 4) the jury did not see all the exhibits presented during trial; 5) the assistant district attorney general manipulated the slide projector during trial; 6) the trial court erred by not allowing the defendant to remove his clothing and show his scars from injuries sustained in a 1997 shooting; and 7) the trial court abused its discretion in denying his motion for the jury to visit the crime scene.  After careful review, we conclude that no reversible error exists and affirm the judgment from the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ALAN E. GLENN and J.C. MCLIN, JJ., joined.

Charles R. Curbo and Michael McCullar, Memphis, Tennessee, for the appellant, Tony Wolfe.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and David Zak, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The underlying crime occurred at a Memphis convenience store following an altercation between the defendant, the victim, and several other men.  The defendant shot and killed the victim when the victim exited the store.

At trial, the defendant asserted that the victim, Leondous Hawkins, and the two men with Hawkins were members of a gang that shot him in 1997.  He contended that the three men displayed weapons to him inside the convenience store.  He denied that he waited for the men to exit the store.  He said that the trio shot at him and that he then shot at them in self-defense.

One member of the victim's group, Brian Winbush, testified that they stopped at the Shell convenience store after attending a concert on September 11, 2004. He testified that they were all wearing t-shirts with "901 Lauderdale" printed on them, a reference to their address. He said that they passed the defendant in the store and spoke to Jamilah Lloyd, the woman accompanying the defendant. Winbush testified that the defendant and the third member of their group, Prenston Moore, had a "private conversation" in the store and that, afterward, the defendant exited. He testified that the victim and Moore walked to the door while he paid for his food. Winbush said he heard gunshots and saw the victim fall to the ground. He testified that the defendant got into a car and left the scene.

Prenston Moore also testified that Winbush spoke to the defendant's girlfriend when they entered the store. He said that he noticed the defendant looking at Winbush "kind of funny." He asked if Winbush knew the defendant, and Winbush said that he knew Ms. Lloyd.

Moore said that the defendant approached him when they were paying for their food and called him by his nickname, "Twin." The defendant then asked him, "[W]hy your nigger called me a bitch?" He said that he told the defendant, "[W]hy you asking me, man, about somebody who's just standing behind me?" The defendant exited the store but was pacing outside. Moore said that he took his food to the car and intended to ask the defendant what the problem was. When he turned around, the defendant began to shoot at him. Moore said that he ran around the building and fled over a fence. When he returned to the store, the victim had been shot. He testified that no one possessed a gun that night except the defendant.

Katerina Jones testified that she was with the victim, Moore, and Winbush and that she remained in the car while they went inside the convenience store. She said that Moore exited the store with his food, which he set on the car, and started talking to the defendant. Jones testified that the defendant took a gun from his pocket and began to shoot. She said that Moore ran away, but the victim was shot as he exited the store. She also testified that the defendant shot the victim a second time and that the defendant shot a total of five or six times.

A security guard at the convenience store testified that he saw the trio arrive and order food, followed shortly thereafter by the defendant and his girlfriend. He said that the defendant and the victim exchanged words about the defendant's girlfriend and that the defendant then left. The security guard testified that the defendant appeared to be waiting for the group to come outside. After the victim left the store, he heard gunfire. He went to the front of the store where he saw the victim on the pavement. The defendant shot the victim in the head and fled the scene. He did not see the victim or the two men with him with weapons.

The defendant's girlfriend testified that she saw Brian Winbush and chatted with him for a minute. She could see that Winbush and the defendant looked at each other in a "funny way." She said that she exited the store, followed by the defendant. She said that the defendant was arguing with Moore, and that the defendant then pulled out a gun and started shooting. She said that Moore ran away and that she ducked down in the car. She said that when she raised her head, she saw the

victim on the ground. The defendant ran back to the car, and they left. She recalled that the defendant threw the gun out the window and that he never said anything about what happened, except that he said a prayer hoping that no one was hurt.

A witness to the shooting testified that she was parked at the gas pump and observed two men arguing. She said that one man began to shoot. She recalled that he shot three times, then walked over to the victim, who was seated on the ground with his back against the store glass, and shot him in the head. She did not see the victim make any kind of gesture with his hand prior to being shot. She did not see the shooter's face during the incident.

Another witness testified that she was asleep in a car at the convenience store and was awakened by the first shot. She looked out of the car and saw the victim fall down. She said that a man with a gun walked over and shot the victim "one last time." She did not see the face of the shooter.

The chief medical examiner for the State of Tennessee testified that he reviewed the autopsy of the victim. He said that the victim sustained two gunshot wounds to his body, one to the head and one to a leg. He indicated that the gunshot wound to the leg would not have caused his death. He further testified that the gunshot wound to the head was the fatal wound.

Officer Marcus Berryman documented the crime scene and recovered four shell casings and two bullets. He said that a spilled food tray and soft drink were found near the victim's body.

A firearms expert with the Tennessee Bureau of Investigation testified that he was provided with four empty shell casings, two lead bullets, and bullet fragments taken from the crime scene. He said that the four spent casings were all fired from the same 9mm pistol. He said that the two spent bullets were also fired from the same 9mm pistol.

Officer T. J. Helldorfer testified that he was familiar with gang-related shootings but had no indication that this shooting was gang-related. He did not think that "901 Lauderdale" was a Memphis gang but agreed that wearing similar items of clothing was characteristic of gangs.

An investigator with the District Attorney's office testified that he had specialized training in gangs and that he had never heard of any gang related to "901 Lauderdale." He said that none of the men in the victim's trio that night had any known gang affiliation.

The defendant testified that he had been shot six times in 1997 by someone wearing a shirt with "901" on it. He testified that he must have dialysis three days a week as a result of these injuries. He recalled that on the night of the incident, he and his girlfriend were leaving the store as the victim and his friends entered. He said that Winbush said hello to his girlfriend and that he did not think anything of it until he heard Moore say something to Winbush about it. He said that Moore said, "[W]hy that bitch ass nigger looking at you because you looked at his girl?" The defendant

then bought cigarettes at the cash register. More words were exchanged with the group before the defendant left the store with his girlfriend.

The defendant testified that he decided to go back inside to get some snacks and passed Winbush, who was holding a Styrofoam tray. He said that he saw Winbush take his hand off the tray and put it in his pocket where he appeared to have the handle of a weapon. The defendant testified that he heard the victim threaten to "blow his ass off" when they were inside the store. He said he left the store, and Moore came outside with his food. He recalled that Moore began walking toward him and pulled out a gun. As he fled, the defendant drew his gun and began to fire at Moore. The defendant said he was going to flee but saw someone in a white shirt crouched down beside another car. The defendant said that when the person began to stand up, he shot at the person, retreated to his car, and left the scene. He said that two shots were fired at him as he drove away.

During cross-examination, the defendant said that he was afraid for his life but went back to the store to look for his cellular telephone. The defendant denied that the security tape showed him waiting outside the store for someone. He acknowledged that he could have gotten in his car and driven away but did not do so.

Analysis

The defendant raises seven issues on appeal. Of these seven issues, he has only supported one claim with any authority. His arguments are merely conclusions without the benefit of any support. The defendant supports only his second issue with legal authority: the trial court abused its discretion by holding trial during unreasonable hours. All other issues are waived for the defendant's failure to cite authority to support his argument. *See* Tenn. Ct. Crim. App. R. 10(b); *State v. Schaller*, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997).

The defendant argues that the trial court erred by conducting the trial under unreasonable hours "for no good reason." He contends that the trial judge was in a rush to conclude the trial because he had just returned from a vacation. Specifically, the defendant argues that the trial was conducted late into the night, which rendered him tired and unable to concentrate.

The record reflects that jury voir dire began on Monday, January 22, 2007. The record does not show the time the proceedings ended that day. The trial resumed on January 23, 2007, at 9:25 a.m. The record reflects that counsel for the defendant was forty-five minutes late for the proceedings. The record also does not establish when court was adjourned on that date. The State submits that the record contains an exchange between the trial court and trial counsel regarding review of evidence. The trial court told trial counsel that he could review the evidence either that evening or the following morning because they would start late due to the defendant's dialysis. The State argues that this exchange infers that the proceedings did not carry on into the evening that date because the court suggested that there would be time for trial counsel to review the evidence.

The proceedings resumed at 1:25 p.m. on Wednesday, January, 24, 2007. The court adjourned at 10:30 p.m., following the testimony of one of the police officers. The third day of testimony was Thursday, January 25, 2007. The trial court stated, out of the jury's presence, that they would try to go as long as possible that day, possibly until 9:00 or 10:00 p.m. Trial counsel informed the court that he was taking medicine that might affect his ability to work longer hours and might render him ineffective. The trial court asked counsel if he wanted a mistrial, and he declined. He said he felt fine but surmised that he could only work until 8:30 p.m. that day. The record reflects that the court adjourned sometime after 10:00 p.m., after trial counsel concluded his direct examination of the defendant. The State objected that trial counsel had deliberately engaged in time-consuming irrelevant questioning to circumvent the State from conducting an immediate cross-examination.

Trial counsel did not complain that the late hour was affecting his ability to represent his client. The record reflects that trial counsel stated that he was being "thorough" in his direct examination. The record further reflects that the trial court took a long dinner break and several additional breaks throughout the day.

The trial resumed at 1:30 p.m. on Friday, January 26, 2007. The trial adjourned at approximately 10:00 p.m., following closing arguments. The jury returned on Saturday morning at 9:00 a.m. for deliberations and rendered a verdict at 10:45 a.m.

The trial court entered the following memorandum into the record:

No motion was made prior to trial concerning lawyers not being able to work a full day. Nothing was mentioned until the third day of trial that Mr. Curbo, defense attorney was on medication.

The court was not informed before trial that the defendant was on dialysis requiring defendant to spend 4 hours from 8:00 a.m. to 1:00 p.m. every Monday, Wednesday and Friday.

Since proof could not be presented unless defendant was present it has became (sic) necessary to work nights to complete the trial which is sequestered.

The court has observed defense counsel during the trial and it did not appear to this court that the lawyer was impaired or tired or unable to do his job during this trail (sic). The court notes defense attorney asked many questions. Questions were asked and answered on many occasions causing the trial to proceed very slowly. This was done by the defense attorney. Mr. Curbo, the defense attorney stated many times he had to "turn every stone in representing his client." This seemed to be his response when he asked the same questions more than once. Mr. Curbo, the defense lawyer also off the record said he would need at least 5 hours to cross examine one witness.

-5-

This court addressed the issue of late night court sessions in *State v. Parton*, 817 S.W.2d 28, 33 (Tenn. Crim. App. 1991), and concluded that late night court sessions should be scheduled "only when unusual circumstances require it." 817 S.W.2d at 33 (quoting *State v. McMullin*, 801 S.W.2d 826, 832 (Tenn. Crim. App. 1990). The court also stated that late night sessions should be avoided and must be justified because of unusual circumstances. *Id*.

Our review of the record reflects that unusual circumstances were present here. The jury was sequestered, and the defendant's dialysis precluded morning sessions three times a week. Under these circumstances, it was reasonable for the trial court to conduct later sessions. The trial court was faced with holding short sessions on the days the defendant underwent dialysis. The decision was made to conduct extended sessions that were, in essence, a normal working day. Thursday was the only day, based on the record, that the trial court went beyond standard workday hours. The longer Thursday session was conducted with liberal recesses and breaks. The defendant is not entitled to any relief on this issue.

CONCLUSION

Based on the foregoing and the record as a whole, we affirm the judgment from the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE